UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JAMES GLEASON,

        Petitioner,                           Hon. Wendell A. Miles

v.                                                  Case No. 5:05-CV-171

BLAINE LAFLER,

        Respondent.
_____/

## REPORT AND RECOMMENDATION

This matter is before the Court on Gleason's petition for writ of habeas corpus. In accordance with 28 U.S.C. § 636(b) authorizing United States Magistrate Judges to submit proposed findings of fact and recommendations for disposition of prisoner petitions, the undersigned recommends that Gleason's petition be **denied**.

## BACKGROUND

As a result of Petitioner's alleged involvement in a burglary that occurred on or about October 24, 2002, Petitioner was charged with First Degree Home Invasion. (Trial Transcript, January 10, 2003, 13-14). Several individuals testified at Petitioner's jury trial. The relevant portions of their testimony are summarized below.

1

**Scott Tebeau**

Tebeau did not attend school on October 24, 2002, due to illness, but instead stayed home. (Tr. 77-78). At approximately 1:45 p.m. that afternoon, Tebeau heard the doorbell ring. (Tr. 79). Tebeau did not answer the door, however, because he had been instructed "not to answer the door when I am home alone." (Tr. 79). Approximately ten minutes later, Tebeau "heard two loud noises" coming from the garage that is attached to their house. (Tr. 79-80, 85). These noises "upset" Tebeau, so he telephoned his mother, informing her "that something was going on, and [that he] wanted her to come home." (Tr. 80). His mother, who worked "about five minutes" away, agreed to return home. (Tr. 80-81).

Approximately three minutes after speaking with his mother, Tebeau "heard a car noise, like a car coming to the house." (Tr. 81). Believing this to be his mother, Tebeau looked out of his window. (Tr. 81). Instead, Tebeau observed "the back end of an old gray car" which he knew did not belong to his mother. (Tr. 81). Tebeau then heard the garage door open. (Tr. 82). Tebeau's family owned a generator which was located in the garage. (Tr. 82). The generator weighed "around" 200 pounds and there were baseball bats leaning up against it. (Tr. 82, 92). Tebeau then heard the baseball bats fall down, followed by "scuffling and noises" and the closing of the garage door. (Tr. 82). Tebeau then looked out of the window and watched the gray car "leaving the driveway," immediately after which Tebeau observed his mother "driving down the street." (Tr. 82-83).

Tebeau's mother stopped "right in front of the driveway" and spoke with somebody in the gray car for "a few seconds." (Tr. 83-84). Tebeau's mother then "came up the driveway and noticed that the generator was gone." (Tr. 84). After his mother returned home, Tebeau inspected

2

the "side door" entry into the garage and discovered that "the frame was bent, like it had been smashed in." (Tr. 84). The button to operate the garage door opener was located inside the garage. (Tr. 85). Tebeau testified that approximately twenty minutes elapsed from the time he heard the doorbell ring until his mother returned home. (Tr. 85).

**Vikki Tebeau**

Tebeau testified that as of the morning of October 24, 2002, her family owned a "pretty large" generator which was located in their garage. (Tr. 96-99). She reported that there were baseball bats leaning up against the generator. (Tr. 99). Tebeau testified that the side door into her garage "was always kept locked." (Tr. 98).

At approximately 2:00 p.m. that day, she received a telephone call from her son, Scott. (Tr. 99). Scott informed her that "he had heard a noise" and was upset. (Tr. 99-100). Vikki Tebeau told Scott that she would immediately return home. (Tr. 100). She arrived home approximately five minutes later. (Tr. 100). As she approached her driveway, she observed "a man in a car coming down my driveway, coming down and in reverse." (Tr. 100). Tebeau reported that her home has a "long driveway." (Tr. 101). When she reached her driveway, Tebeau stopped her vehicle and opened her window. (Tr. 101). The man exiting her driveway also stopped and opened his window. (Tr. 101). Tebeau identified this man as Petitioner. (Tr. 101). Tebeau further testified that she observed only one person in Petitioner's vehicle. (Tr. 100).

Tebeau testified that because her vehicle rode higher than Petitioner's vehicle she could see down into Petitioner's vehicle. (Tr. 102). When Tebeau looked in Petitioner's vehicle, she immediately saw her generator on the front seat. (Tr. 102, 105). Tebeau did not say anything

3

to Petitioner, who volunteered to Tebeau that he was "looking for a guy named Jamie, but I guess I have got the wrong address." (Tr. 101-09). Immediately after making this statement, Petitioner "took off." (Tr. 102-03). Tebeau drove into her garage and immediately noticed that her generator had been stolen. (Tr. 103). She observed scratch marks, matching the color of the generator's frame, on the garage floor and on the driveway. (Tr. 104). Tebeau also discovered that the side entry door into the garage was "broken." (Tr. 105). Tebeau reported that she purchased the generator in May 1999 for $1,098. (Trial Transcript, January 13, 2003, 8-9). She further reported that the generator was in good working order on the day it was stolen. (Tr. 9).

**Robert Herrick**

As of October 24, 2002, Herrick was employed as a deputy for the Ingham County Sheriff's Department. (Trial Transcript, January 10, 2003, 111). At approximately noon of that day, Deputy Herrick was instructed to attempt to locate a "suspicious vehicle" that had been spotted in the immediate vicinity of the Tebeau residence. (Tr. 113-16). The description of this "suspicious vehicle" matched the description of the vehicle Scott and Vikki Tebeau observed driving away from their residence later that afternoon. (Tr. 113-16). The license plate of this "suspicious vehicle" was registered to Petitioner. (Tr. 114-16).

**Steve Sopocy**

As of October 24, 2002, Sopocy was employed as a detective with the Ingham County Sheriff's Office. (Tr. 117-18). Following the robbery, Sopocy conducted a photographic line-up, from which Vikki Tebeau selected Petitioner as the man who stole her generator. (Tr. 118-23).

**Jeffrey Joy**

As of October 24, 2002, Joy was employed as a Detective Lieutenant with the Ingham County Sheriff's Department. (Trial Transcript, January 13, 2003, 4). Joy was present when Deputy Sopocy conducted the photographic line-up with Vikki Tebeau. (Tr. 4). Joy testified that Tebeau selected Petitioner from this line-up. (Tr. 4-5).

**James Gleason**

Petitioner acknowledged that he was, in fact, the individual who Vikki Tebeau witnessed driving away from her residence on October 24, 2002. (Tr. 18). Petitioner also acknowledged that at the time there was a generator in his vehicle. (Tr. 18). Petitioner asserted, however, that he did not know that the generator belonged to the Tebeaus. (Tr. 18).

Petitioner testified that earlier that day he had received a telephone call from his friend, Pete Rauls, informing him that "some friends of his had given him a generator and he needed a ride." (Tr. 19). Petitioner stated that he arrived in the vicinity of the Tebeau residence at approximately 11:30 a.m. that morning, but that he was unable to locate Rauls because he was "lost." (Tr. 19). Petitioner testified that he then returned home and spoke with Rauls on the telephone. (Tr. 19). Rauls provided Petitioner with the address at which the Tebeaus resided. (Tr. 19). Petitioner drove to the Tebeau residence, arriving at "20 minutes to 2:00." (Tr. 19-20).

As he arrived at the Tebeau residence, he observed Rauls "standing by a garage." (Tr. 20). As he pulled in the driveway, Petitioner observed Rauls enter the garage through a side door. (Tr. 20). Rauls then opened the garage door and drug the generator to Petitioner's vehicle. (Tr. 20). The pair then loaded the generator into the front seat of Petitioner's vehicle. (Tr. 20-21). Rauls then

5

closed the garage door and climbed into the back seat of Petitioner's vehicle. (Tr. 21). As Petitioner was backing out of the Tebeau's driveway, he observed "a brown vehicle trying to get into the driveway." (Tr. 21). Petitioner asked Rauls, "who's that?" (Tr. 21). Rauls "ducked down in the back seat" and stated, "man, let's just get out of here." (Tr. 21). Petitioner then opened his window and said he was "looking for Jamie," but "got the wrong address." (Tr. 21). Petitioner then drove away. (Tr. 21).

Following a jury trial, Petitioner was convicted of First Degree Home Invasion. (Tr. 109). As a third habitual offender, Petitioner was sentenced to serve 10-40 years in prison. (Sentencing Transcript, Feb. 12, 2003, 5-8). Petitioner appealed his conviction to the Michigan Court of Appeals asserting the following claims:

> I.  Did the trial court abuse its discretion by denying Defendant's motion for new trial alleging that his exercise of his constitutional right to remain silent was improperly used against him in cross-examination and argument and that his attorney's failure to object resulted in the denial of his right to effective assistance of counsel?

The Michigan Court of Appeals affirmed Petitioner's conviction. *People v. Gleason*, No. 247615, Opinion (Mich. Ct. App., Nov. 16, 2004). Asserting the same claims, Petitioner then moved in the Michigan Supreme Court for leave to appeal. The court denied Petitioner's request, stating that "we are not persuaded that the questions presented should be reviewed by this Court." *People v. Gleason*, No. 127761, Order (Mich., June 28, 2005). Asserting the same claims, Petitioner submitted the present petition for writ of habeas corpus on December 1, 2005.

**STANDARD OF REVIEW**

Gleason's petition, filed December 1, 2005, is subject to the provisions of the Antiterrorism and Effective Death Penalty Act (AEDPA), as it amended 28 U.S.C. § 2254. The AEDPA amended the substantive standards for granting habeas relief under the following provisions:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim —
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

The AEDPA has "modified" the role of the federal courts in habeas proceedings to "prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." *Bell v. Cone*, 535 U.S. 685, 693 (2002).

Pursuant to § 2254(d)(1), a decision is "contrary to" clearly established federal law when "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000); *see also, Lancaster v. Adams*, 324 F.3d 423, 429 (6th Cir. 2003).

Prior to *Williams*, the Sixth Circuit interpreted the "unreasonable application" clause

of § 2254(d)(1) as precluding habeas relief unless the state court's decision was "so clearly incorrect that it would not be debatable among reasonable jurists." *Gordon v. Kelly*, 2000 WL 145144 at *4 (6th Cir., February 1, 2000); *see also*, *Blanton v. Elo*, 186 F.3d 712, 714-15 (6th Cir. 1999). The *Williams* Court rejected this standard, indicating that it improperly transformed the "unreasonable application" examination into a subjective inquiry turning on whether "at least one of the Nation's jurists has applied the relevant federal law in the same manner" as did the state court. *Williams*, 529 U.S. at 409.

In articulating the proper standard, the Court held that a writ may not issue simply because the reviewing court "concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Williams,* 529 U.S. at 411. Rather, the Court must also find the state court's application thereof to be *objectively* unreasonable. *Bell*, 535 U.S. at 694; *Williams*, 529 U.S. at 409-12. Accordingly, a state court unreasonably applies clearly established federal law if it "identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular...case" or "if the state court either unreasonably extends a legal principle from [the Supreme Court's] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." *Lancaster*, 324 F.3d at 429 (quoting *Williams*, 529 U.S. at 407).

Furthermore, for a writ to issue, the Court must find a violation of Supreme Court authority. The Court cannot look to lower federal court decisions in determining whether the relevant state court decision was contrary to, or involved an unreasonable application of, clearly established Federal law. *See Harris v. Stovall*, 212 F.3d 940, 943-44 (6th Cir. 2000).

Pursuant to 28 U.S.C. § 2254(d)(2), when reviewing whether the decision of the state court was based on an unreasonable determination of the facts in light of the evidence presented, the factual findings of the state court are presumed to be correct. *See Warren v. Smith*, 161 F.3d 358, 360 (6th Cir. 1998) (citing 28 U.S.C. § 2254(e)(1)). Petitioner can rebut this presumption only by clear and convincing evidence. *Id.*

## ANALYSIS

I.      **Due Process Claim**

The Fifth Amendment to the United States Constitution provides, in part, that "[n]o person. . .shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. In *Miranda v. Arizona*, 384 U.S. 436 (1966), the Court held that "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." *Id.* at 445. These well-known safeguards, one component of which requires the police to inform an arrestee that he has the right to remain silent and that anything he does say may be used against him, are generally referred to as the Miranda warnings.

While the Miranda warnings "contain no express assurance that silence will carry no penalty, such assurance is implicit to any person who receives the warnings." *Doyle v. Ohio*, 426 U.S. 610, 618 (1976). The choice by a criminal defendant to remain silent after receiving these warnings is "insolubly ambiguous," as it may represent "nothing more than [his] exercise of these Miranda rights." Id. *at* 617. Concluding that it would be "fundamentally unfair" to impeach the credibility of a criminal defendant with the fact that he remained silent after being advised of the

9

right to remain silent, the *Doyle* Court held that such conduct violated the Due Process Clause of the Fourteenth Amendment. *Id.* at 618-20.

Petitioner asserts that the prosecutor engaged in improper impeachment by eliciting that he remained silent after being advised of his Miranda rights. Petitioner asserts that as a result his due process rights were violated, thereby entitling him to relief. The Court disagrees.

On direct examination, the following exchange occurred between Petitioner and his attorney:

> Q: After you left, what did you do with Pete and this generator; did you drop Pete somewhere. Or what happened next?
>
> A: Yeah. I told him if anything comes back to me -- this is what I told him when I left because I knew something was amiss. I told him if it comes back to me, I was going to turn him in because I didn't want no part of having anything to do with what had happened. So after I told him that, we kind of got into some argument and I dropped him off at -- in Lansing on Washington Street.

(Trial Transcript, Jan. 13, 2003, 22-23).

The questioning to which Petitioner objects is contained within the following exchange between Petitioner and the prosecutor during cross-examination:

> Q: And you indicated at some point to Mr. Rauls that if something ever came of this, you would turn him in; is that correct?
>
> A: That's correct.
>
> Q: And at some point in time you were arrested for this offense; is that correct?
>
> A: That's correct.

10

Q: And you did not contact the prosecution or the police and give this information about Mr. Rauls --

(Whereupon, alarm goes off.)

COURT: Great. That scared you?

DEPUTY: Yes, it did.

COURT: What's up, Michael?

COURT OFFICER: Well, the alarm just went off. Let me find out what it is. It may be a false alarm.

(At about 9:20 A.M., discussion held off the record.)

COURT: Get your coats, folks.

(At about 9:20 A.M., proceedings adjourned.)

(At about 9:43 A.M., proceedings reconvened.)

COURT: Please be seated. Excuse the interruption. Mr. Murray, you may begin again.

MR. MURRAY: Thank you, your Honor.

Q: (BY MR. MURRAY): Mr. Gleason, you indicated that you told this Pete Rauls that if you -- if anything came of this that you would turn him in to the police; is that correct?

A: That is correct.

Q: And you did not do that; is that correct?

A: No, sir, that's not true.

Q: You did tell somebody about Mr. Rauls?

11

A: When I was first arrested, the next day, they took me down for an interview, asked me if I wanted an attorney present and I said yes, I would like one. They stopped the interview right then, sent me back. After I received my attorney, I asked them, I sent numerous kites.

Q: What's a kite?

A: A kite is a note you send when you're in jail so you can speak to different people like lieutenants, detectives. I didn't know my detectives' names in my case because I had no paperwork, so I had sent kites to the daytime lieutenant numerous kites saying I would like to speak to the detectives with my attorney present. I never got any response from them.

Q: How many is numerous?

A: Probably four or five.

Q: You had an attorney at that point, Mr. Fleming?

A: Yes.

Q: You knew Mr. Fleming's phone number?

A: No, sir, I didn't.

Q: Did you have contact with Mr. Fleming prior to trial?

A: Yes, I have.

Q: And you didn't convey that information to Mr. Fleming?

A: I did, and I believe Friday before trial was set, he referred that information to you.

Q: Friday before trial?

A: Yes, sir, he told me that he had told you --

12

>   Q: Well, I'm going to object to hearsay. That's what are you're indicating?
>
>   A: That that's what my attorney told me. That's all I know.

(Tr. 26-28).

Petitioner's claim that his due process rights were violated fails for several reasons: (1) there is no evidence that the prosecutor impeached Petitioner by referencing any *post-Miranda* silence; (2) Petitioner was not *improperly* impeached with any such silence given his testimony that he did, in fact, inform the police of Pete Rauls' identity; and (3) even if the prosecutor's questioning was improper, any such error is harmless in light of the overwhelming evidence of Petitioner's guilt.

   A. Petitioner has Failed to Establish that he was Informed of his *Miranda* Rights

Petitioner asserts that the exchange above reveals that the prosecutor improperly impeached him at trial by the fact that he remained silent after being informed that he had the right to remain silent. The record, however, contains no evidence that Petitioner was ever informed that he had the right to remain silent or that anything he did say could be used against him. While Petitioner testified that following his arrest he was asked "if I wanted an attorney present" (to which he responded in the affirmative), Petitioner never testified that he was informed that he had the right to remain silent or informed of his Miranda rights. No other witness testified that Petitioner was informed of these rights and the record contains no documentary evidence that Petitioner was informed of his Miranda rights. Furthermore, while the Michigan Court of Appeals analyzed Petitioner's claim as if he had been informed of his *Miranda* rights, it did not find that such was, in fact, the case.

As the Supreme Court has held, "absent the sort of affirmative assurances embodied in the *Miranda* warnings, the Constitution does not prohibit the use of a defendant's postarrest silence to impeach him at trial." *Greer v. Miller*, 483 U.S. 756, 763 (1987). While it may certainly be reasonable to conclude from Petitioner's testimony that he was informed of his *Miranda* rights, Petitioner is not entitled to habeas relief on the basis of inference or conjecture. To demonstrate that his rights under *Doyle* were violated Petitioner *must* demonstrate that he was first informed of his right to remain silent. *Id.* (recognizing that receiving the "implicit assurance of *Miranda* warnings" is the "prerequisite of a *Doyle* violation"). Petitioner has failed to establish that he was informed of his right to remain silent prior to the conduct about which he was questioned on cross-examination.

### B. Petitioner was not Improperly Impeached

There exist at least two reasons why the impeachment about which Petitioner objects was appropriate. First, as previously noted, the concern underlying the *Doyle* decision was that it is fundamentally unfair to use a defendant's post-*Miranda* silence to impeach the credibility of his trial testimony. An examination of the exchange quoted above, however, reveals that Petitioner was not impeached with the fact that he opted to remain silence after having been informed of the right to do so. Rather Petitioner was impeached by the evidence that he attempted to speak with the police but was apparently unsuccessful. In the context of the concerns underlying the *Doyle* holding, the Court discerns a perhaps subtle, but nonetheless very significant, distinction between a defendant who is impeached by evidence that he remained silent after being informed of the right to do so and a defendant who is impeached by evidence that his attempts to speak were not successful. In the former instance, the impeachment is improper because it constitutes punishment in response to the

14

exercise of a fundamental constitutional right. This concern is not present in the latter circumstance because the defendant did not choose to exercise his right to remain silent. However, even if the exchange in question is characterized as an impeachment of Defendant by reference to his (allegedly) post-*Miranda* silence, the result is the same.

Petitioner testified on direct examination that following the Tebeau robbery he told Pete Rauls that "if it comes back to me, I was going to turn him in because I didn't want no part of having anything to do with what had happened." On cross-examination, the following exchange occurred:

> Q: (BY MR. MURRAY):  Mr. Gleason, you indicated that you told this Pete Rauls that if you -- if anything came of this that you would turn him in to the police; is that correct?
>
> A: That is correct.
>
> Q: And you did not do that; is that correct?
>
> A: No, sir, that's not true.

As this brief exchange reveals, Petitioner reiterated on cross-examination that he told Rauls that he would "turn him in" if "anything came of this." When the prosecutor then questioned Petitioner whether he did, in fact, inform the police of Rauls' identity, Petitioner testified that he had done so.[1] The questioning to which Petitioner objects occurred after Petitioner asserted that he had, in fact, informed the police of Rauls' identity.

As noted above, in *Doyle* the Court held that it constituted a violation of due process

---

[1] The Court recognizes that the question and answer upon which this conclusion is based are both asked and answered in the negative; nonetheless, the content of Petitioner's testimony is, in the Court's estimation, quite clear. When challenged by the prosecutor with the statement, "and you did not do that" (clearly referring to Petitioner's testimony that he would identify Rauls to the police), Petitioner stated that "that's not true." Put simply, while worded in the negative, Petitioner clearly testified that he had, in fact, informed the police of Rauls' identity.

to impeach the credibility of a criminal defendant with the fact that he opted to remain silent after being advised that he had the right to do so. The *Doyle* Court also recognized, however, that it is perfectly appropriate to use post-*Miranda* silence to impeach a defendant regarding his alleged post-*Miranda* behavior. As the Court stated:

> It goes almost without saying that the fact of post-arrest silence could be used by the prosecution to contradict a defendant who testifies to an exculpatory version of events and claims to have told the police the same version upon arrest. In that situation the fact of earlier silence would not be used to impeach the exculpatory story, but rather to challenge the defendant's testimony as to his behavior following arrest.

*Doyle*, 426 U.S. at 619 n. 11.

That is precisely what the prosecutor did in this instance. Given Petitioner's testimony that he informed the police of Rauls' identity, the prosecutor was permitted to cross-examine Petitioner as to the credibility of that statement. That such impeachment allegedly implicated Petitioner's post-*Miranda* silence is of no consequence. Thus, the questioning about which Petitioner objects constitutes proper impeachment.

### C. The Prosecutor's Closing Argument was Proper

Petitioner also asserts that during closing argument the Prosecutor improperly referenced his post-*Miranda* silence. The comments at issue are as follows:

> Now, Mr. Gleason would like you to believe that he dropped this guy off at some apartment, doesn't give you an address. He gives you a name today which he doesn't give to anybody else prior to today, certainly not the police, even though he claims he tried hard to give this information.

\*   \*   \*

> In addition, defense attorney said that the defendant had the right to remain silent. That's correct. But he's the one under oath that testified that he told this imaginary friend that if anything happened in this case that he was going to tell the police about it and he didn't do it.

(Trial Transcript, Jan. 13, 2003, 62, 76).

As discussed above, the questioning of Petitioner on this matter did not violate Petitioner's constitutional rights. The challenged comments concern the prosecutor's argument concerning the facts elicited through proper cross-examination. Accordingly, the prosecutor's arguments did not violate Petitioner's due process rights.

D. Any *Doyle* Error was Harmless

Finally, even if the Court were to construe the exchange in question as constituting a due process violation Petitioner is still not entitled to relief. Violations of the rule articulated in *Doyle* are subject to harmless error analysis. *See Burton v. Bock*, 187 Fed. Appx. 465, 471 (6th Cir., June 27, 2006).

In the habeas context, the applicable harmless error standard was articulated in *Brecht v. Abrahamson*, 507 U.S. 619 (1993), in which the Court held that habeas relief is warranted only if the error "had substantial and injurious effect or influence in determining the jury's verdict." *Id*. at 637. This requires Petitioner to demonstrate "actual prejudice" resulting from a constitutional error. *Id.*; *Ford v. Curtis*, 277 F.3d 806, 809 (6th Cir. 2002). Petitioner can make no such showing. As detailed above, even excluding the evidence to which Petitioner objects, the evidence supporting his guilt was simply overwhelming.

The Michigan Court of Appeals concluded that this particular claim was without

17

merit. *People v. Gleason*, No. 247615, Opinion at 1-2 (Mich. Ct. App., Nov. 16, 2004). In light of the authority herein identified, the Court concludes that the decision of the Michigan Court of Appeals is neither contrary to, nor involves an unreasonable application of, clearly established federal law. Furthermore, its decision was not based on an unreasonable determination of the facts in light of the evidence presented. Accordingly, this claim presents no issue on which habeas corpus relief may be granted.

II.     **Ineffective Assistance of Counsel Claim**

Petitioner asserts that his trial counsel "seriously erred" by failing to object to the line of questioning detailed above regarding Petitioner's actions and statements following his arrest. Petitioner asserts that his attorney's shortcoming in this regard deprived him of the right to the effective assistance of counsel.

To establish that he was denied the right to the effective assistance of counsel, Petitioner must establish that his counsel's performance was so deficient that he was not functioning as the "counsel" guaranteed by the Sixth Amendment. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). Accordingly, it must be demonstrated that counsel's actions were unreasonable under prevailing professional norms. *Id.* at 688. In making this determination, however, the Court must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the [Petitioner] must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Id.* at 689.

Petitioner must further establish that his attorney's performance was prejudicial in that it denied him a fair trial. *Id.* at 687. This is a heavy burden for Petitioner to meet, because he

must establish that his counsel's performance was "so manifestly ineffective that defeat was snatched from the hands of probable victory." *United States v. Morrow*, 977 F.2d 222, 229 (6th Cir. 1992) (*en banc*), *cert. denied*, 113 S. Ct. 2969 (1993) (emphasis in original).

As discussed above, there was nothing improper about the questioning to which Petitioner believes his attorney should have objected. Thus, Petitioner cannot demonstrate that his attorney's performance was deficient. Moreover, even if the Court assumes that Petitioner's counsel should have objected to the questioning at issue, given the overwhelming evidence of his guilt, Petitioner cannot demonstrate that he suffered any prejudice as a result of his attorney's alleged deficient performance.

The Michigan Court of Appeals found Petitioner's claims of ineffective assistance to be without merit. *People v. Gleason,* No. 247615, Opinion at 2-3 (Mich. Ct. App., Nov. 16, 2004). In light of the authority herein identified, the Court concludes that the decision of the Michigan Court of Appeals is neither contrary to, nor involves an unreasonable application of, clearly established federal law. Furthermore, its decision was not based on an unreasonable determination of the facts in light of the evidence presented. As such, this claim presents no issue on which habeas corpus relief may be granted.

## **CONCLUSION**

For the reasons articulated herein, the undersigned concludes that Petitioner is not being confined in violation of the laws, Constitution, or treaties of the United States. Accordingly, the undersigned recommends that Gleason's petition for writ of habeas corpus be **denied**.

OBJECTIONS to this Report and Recommendation must be filed with the Clerk of

Court within ten (10) days of the date of service of this notice.  28 U.S.C. § 636(b)(1)(C).  Failure to file objections within the specified time waives the right to appeal the District Court's order.  *Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

                                      Respectfully submitted,

Date:  March 7, 2008                      /s/ Ellen S. Carmody
                                          ELLEN S. CARMODY
                                          United States Magistrate Judge